Opinion filed January 18, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2358 |
| KENNRITH L. FOSTER, | ) ) ) | Honorable Donald Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, defendant, Kennrith L. Foster, was found guilty of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), three counts of armed robbery (720 ILCS 5/18-2(a)(2)-(4) (West 2016)), three counts of armed violence (720 ILCS 5/33A-2(a)-(c) (West 2016)), aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2016)), aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2016)), and unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)). The trial court sentenced defendant to an aggregate 80 years' incarceration in the Department of Corrections. Defendant appeals, and we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      In February 2018, defendant was charged with the offenses referenced above arising out of the beating, strangling, and shooting of Angela Edmonds[1] on December 17, 2017.

¶ 4      At defendant's arraignment, the trial court explained that defendant had the right to plead not guilty and that his trial "either could be a bench trial or jury trial." Defendant pleaded not guilty. Subsequently, before defendant's bench trial, defense counsel explained to the court that defendant "executed and informed me that he wishes to waive Jury but go Bench." Defendant raised no objection. The following colloquy then occurred:

"THE COURT: All right. Let's go through the Waiver, first. Mr. Foster, I have before my [*sic*] a Waiver of Trial by Jury, did you sign this?

THE DEFENDANT: Yes, sir, I did.

THE COURT: You understand if you ask for a trial by the Bench, most likely myself on Monday, and you waive a Jury Trial, you waive it forever, you cannot come back and ask for a Jury Trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has anyone forced you to sign this?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone promised you anything other than the fact you would not have a jury, to sign this?

THE DEFENDANT: No, Your Honor.

---

[1] The charging documents refer to Edmonds as "Angela Foster." At trial, Edmonds testified that, at the time the charging documents were filed, she had changed her surname to "Edmonds" but had not yet changed any of her identification documents.

THE COURT: Has anyone threatened you in any way to sign this?

THE DEFENDANT: No, Your Honor.

THE COURT: You're doing this of your own free will?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay, I'll accept the Waiver and in that case, we'll set it up for trial on Monday."

¶ 5      On October 21, 2019, a bench trial was held. Edmonds testified that she and defendant met in about 2011 and began a dating relationship that eventually led to their marriage in 2015. Within days of their marriage, however, their relationship began to deteriorate, and, in the summer of 2017, Edmonds obtained a divorce from defendant. Thereafter, she began dating a man named Lamongo Snow. On December 10, 2017, after learning of Edmonds's relationship with Snow, defendant began repeatedly calling Edmonds's cell phone. Over several days, defendant called Edmonds "hundreds" of times, begging her to end her relationship with Snow, threatening to harm himself, and threatening to harm her. As a result, Edmonds changed her phone number. On December 15, 2017, Edmonds and Snow married.

¶ 6      Edmonds testified that, in the early-morning hours of December 17, 2017, she was working an overnight shift alone at the Shell gas station and convenience store in Sugar Grove. She described the layout of the convenience store, noting that a long sales counter was situated to the left of the doors as customers enter. Beyond the counter was a short hallway that housed restrooms, as well as an office next to the men's restroom. The office included a sink, a desk, a computer to clock in, and cleaning supplies. A sign on the door to the office read, "Employees Only," and the door was propped completely open by a kickstand.

¶ 7    During Edmonds's shift, defendant called the store phone four times. Because defendant's information appeared on the phone's caller identification, Edmonds ignored the first several calls. Eventually, however, Edmonds answered, and defendant told her that he forgave her "for getting married," but that she needed to leave Snow. Edmonds told defendant to "move on," then hung up.

¶ 8    Edmonds testified that, minutes later, at about 3 a.m., defendant entered the store and approached her while she stood behind the sales counter. Defendant pointed a gun at Edmonds and told her "Don't run" or he would shoot her. Edmonds ran to the office in the hallway and attempted to close the door, but she was unable to do so because it was propped open by the kickstand. As defendant approached her, she panicked and fell to the ground face-down.

¶ 9    Defendant sat on Edmonds's back and began to hit her in the back of her head with his fist for approximately two minutes. During the struggle, defendant "snatched" Edmonds's wedding rings from her fingers. Right then, Snow attempted to call Edmonds on her cell phone, which was on the floor in front of her, and Edmonds and defendant both reached for the phone. Edmonds grabbed the phone first, but defendant began squeezing her hand and banging it on the ground. Defendant told Edmonds, "You are going to die, B***," and, "If I can't have you, nobody can."

¶ 10    Edmonds testified that, while she begged defendant to stop, defendant, who was still armed with the gun, pulled the trigger. Edmonds testified that she "felt the breeze" from the gun and felt her head hit the floor. Edmonds acknowledged that she did not remember telling police officers that defendant shot her "before he started beating [her]," but she agreed that she would have been clearer as to the sequence of events closer to December 17, 2017. Edmonds explained that, after defendant shot her, he began punching her in the back of the head and strangling her by placing

her in a chokehold for two to three minutes. Edmonds struggled to breathe, and she eventually blacked out.

¶ 11    Approximately 15 minutes after defendant left the Shell station, Andrew Rooker entered the store. Rooker testified that he used the restroom, then grabbed a soda and went to the register. No one was there to wait on him, and he did not see anyone else in the store. After some time, Rooker heard a phone ringing, so he looked toward the back office and "saw a foot through the door." Rooker went to the office and discovered Edmonds on the floor. Rooker checked to see if Edmonds was breathing, then he called 911.

¶ 12    When the police and paramedics arrived at the scene, Edmonds was "groggy." Even so, Edmonds told the first responders that "it was Ken" who hurt her. Sugar Grove police officer Roy Hamold testified that he photographed the scene and observed blood on the floor, but he found no shell casings or jewelry. Kane County Sheriff's Detective Amy Johnson was assigned to assist the Sugar Grove Police Department with evidence recovery. She testified that she did not find any rings, cell phones, shell casings, or projectiles. Johnson learned that a surveillance video existed, and she viewed it.

¶ 13    Edmonds was taken to the emergency room at Presence-Mercy Hospital in Aurora. Upon Edmonds's arrival, Dr. Marlaina Norris inspected her injuries. Dr. Norris testified that Edmonds had a facial hematoma, or enlarged bruising, on the left side of her forehead. Dr. Norris ordered a CAT scan, and she reviewed the images. Dr. Norris observed "a metallic foreign body" on the right side of Edmonds's head, behind her ear. Because there were no head trauma specialists at Presence-Mercy Hospital, Dr. Norris initiated the process to have Edmonds transferred to Good Samaritan Hospital in Downers Grove.

¶ 14    Before Edmonds's transfer, Dr. John Tauscher, a radiologist, also reviewed Edmonds's CAT scan images. Dr. Tauscher testified that he observed hematomas in the subcutaneous tissue in the frontal area above the eye, a bullet-shaped metal object in the subcutaneous tissue of the right side of the skull, and a hemorrhage in the subarachnoid space in the right parietal lobe consistent with trauma from the metal object observed.

¶ 15    After arriving at Good Samaritan Hospital, Edmonds was treated by Dr. Leah Tatebe, a trauma surgeon. Dr. Tatebe testified that she observed several bruises on Edmonds's face and a metal fragment that appeared to be a bullet inside a one-to-two centimeter wound on the back right of her scalp. Dr. Tatebe removed the bullet "pretty eas[ily]" during an exploratory procedure. Dr. Tatebe explained that the bullet did not penetrate Edmonds's skull but that it caused a traumatic brain injury nonetheless. Dr. Tatebe noticed that, while Edmonds underwent physical therapy, Edmonds was unsteady on her feet, needed assistance walking, and suffered from constant nausea.

¶ 16    Lieutenant Richard Robertson of the Aurora Police Department testified as a firearms and firearms ammunition expert. Robertson testified that he reviewed the surveillance video from the store. He noted that he observed a "gaseous discharge" emanate from the gun while defendant held it to the right side of Edmonds's head, which, in Robertson's opinion, established that defendant shot at Edmonds's head at nearly point-blank range. Robertson acknowledged that Edmonds did not suffer the injuries one would expect from being shot under such circumstances. Robertson believed that this was because "environmental factors" caused the ammunition in defendant's gun to malfunction. Robertson explained that, when ammunition is particularly old or exposed to moisture, gunpowder can degrade, such that it does not burn properly. When that occurs, there is insufficient pressure to push out a projectile at a normal velocity and insufficient energy to eject a

shell casing. Robertson noted that, although the surveillance video showed defendant discharging the gun, he saw no evidence of a shell casing being ejected.

¶ 17    Before the State rested, the parties stipulated that defendant was convicted of felony unlawful possession of a controlled substance in Cook County circuit court case No. 00-CR-1192101.

¶ 18    Defendant testified in his own defense. He explained that he moved out of Edmonds's home in November of 2017 and was living in East Chicago, Indiana. On the morning of December 16, 2017, Edmonds called defendant, and they discussed attempting to reconcile their marriage. Defendant claimed that, at that time, he did not know that he and Edmonds were divorced, because he was never served with court papers and he did not appear in court for any divorce proceedings. Consequently, defendant thought that reconciling their marriage "could work." Later that day, however, defendant learned from a family member that Edmonds had, in fact, married Snow. Defendant felt "a lot of pain" and "started getting high and drunk with a friend" to cope. Defendant's friend told him that he should "find out why" Edmonds married Snow and "scare her." Defendant "thought it seemed like a good idea," took a gun from his friend, and left for Edmonds's place of employment.

¶ 19    When defendant arrived, he showed Edmonds the gun and told her, "Don't move." Defendant testified that he did so because he "wanted her to be scared." Defendant admitted that, when Edmonds ran into the office, he followed her and began to hit her because he "wanted her to feel some sort of the physical pain that [he] was feeling emotionally." Defendant then saw that Edmonds's phone was receiving a call from someone identified as "My husband." At that point, he "really knew" that Edmonds had married someone else. Defendant claimed that he did not remember if he had the gun out at that point and did not know if it "went off." Defendant explained

that he put Edmonds in a chokehold to "put her to sleep" so that he could "get away." Defendant admitted that, while Edmonds lay unconscious, he placed his foot on her back and applied pressure, stomped on her with his foot, and jumped on her back—landing with both feet—two or three times. Defendant reiterated that he wanted to cause Edmonds physical pain. Defendant also admitted that he took Edmonds's rings and cell phone because the rings "were the sources of [his] pain" and because he knew her wedding pictures would be on the phone. Defendant then left the store. Defendant maintained that he "never knew that the gun went off."

¶ 20    Following closing arguments, the trial court found defendant guilty on all counts. Defendant filed posttrial motions, including a motion for a new trial and motions alleging ineffective assistance of counsel. On December 23, 2019, the trial court denied those motions.

¶ 21    At sentencing, defendant's counsel asked the court to consider that Edmonds did not suffer life-threatening injuries. Counsel asserted that the bullet did not proceed through Edmonds's skull to her brain and that the bullet was removed with relative ease. Counsel also argued that defendant "led a law-abiding life for a substantial period of time." Counsel referred the court to the presentence investigation report. That report showed that defendant had a criminal history of felonies and misdemeanors dating back to 1991. However, counsel emphasized that defendant's last felony conviction was in 2000, for unlawful possession of a controlled substance, and defendant had no criminal history for the next "approximately 16 years." Counsel further argued that defendant acted under a strong provocation after finding out about Edmonds's marriage to someone else and that defendant's conduct was the result of circumstances unlikely to recur.

¶ 22    The trial court acknowledged that defendant did not have a lengthy criminal history, but it noted that he has nevertheless been "a convicted felon at least since 1991." The court further noted that, while defendant's conduct was the result of circumstances unlikely to recur, that conduct

"was reprehensible" and "one of the most violent attacks I've ever seen." The court rejected defendant's claim that he acted under strong provocation, as defendant drove all the way from Indiana to Sugar Grove, Illinois, and therefore had "at least an hour to think about his actions." Finally, the court explained that Edmonds "should be dead," considering that she "had a bullet literally enter her head." Even so, despite defendant's efforts to shoot, beat, and strangle Edmonds, Edmonds was "able to survive," although "she was not able to walk away from this." Ultimately, the trial court sentenced defendant to 45 years in prison for attempted first-degree murder. That sentence was to run consecutively to concurrent prison terms of 35 years for armed violence, 33 years for armed robbery, and 5 years for unlawful possession or use of a weapon by a felon. Accordingly, the court sentenced defendant to a total term of 80 years of imprisonment.[2]

¶ 23    On January 6, 2020, defendant filed a motion to reconsider the sentence, which the trial court denied on January 30, 2020. Defendant timely appealed.

¶ 24                                    II. ANALYSIS

¶ 25                                A. Jury Trial Right

¶ 26    Defendant first argues that the trial court erred in accepting his jury waiver, because the waiver was invalid. Specifically, he contends that inadequate admonitions by the trial court prohibited him from making a knowing, voluntary, and intelligent waiver. Defendant concedes that he forfeited this issue because he did not challenge the validity of his waiver in the trial court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both a trial objection and written posttrial motion raising the issue are required to preserve issue for review). However, defendant invokes the plain-error doctrine.

---

[2] The trial court determined that the remaining counts merged into the foregoing counts.

¶ 27 Under the plain-error doctrine, a reviewing court may consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in conducting plain-error review, however, is determining whether error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 28 The right to a trial by jury is a fundamental right guaranteed by both the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). A defendant may waive the right to a jury trial, but, to be valid, the waiver must be knowingly and voluntarily made. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). Consistent with these constitutional requirements, section 103-6 of the Code of Criminal Procedure of 1963 provides that "[e]very person accused of an offense shall have the right to a trial by jury unless *** understandingly waived by defendant in open court." 725 ILCS 5/103-6 (West 2016). Section 115-1 further provides that "[a]ll prosecutions except on a plea of guilty or guilty but mentally ill shall be tried by the court and a jury unless the defendant waives a jury trial in writing." 725 ILCS 5/115-1 (West 2016).

¶ 29 While the trial court has a duty to ensure that a defendant's waiver of his or her right to a jury trial is made expressly and understandingly, the court is not required to provide any particular admonition or information regarding that right. *Bannister*, 232 Ill. 2d at 66; *People v. Rincon*, 387 Ill. App. 3d 708, 717-18 (2008). Thus, "[w]hether a jury waiver is valid cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each

case." *Bracey*, 213 Ill. 2d at 269. The pivotal knowledge that the defendant must understand when waiving the right to a jury trial is that the facts of the case will be determined by a judge and not a jury. *Bannister*, 232 Ill. 2d at 69. Defendant bears the burden of establishing that his jury waiver was invalid. *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7.

¶ 30    "Generally, a jury waiver is valid if it is made by defense counsel in defendant's presence in open court, without an objection by defendant." *Bracey*, 213 Ill. 2d at 270; *Rincon*, 387 Ill. App. 3d at 718; see also *People v. Frey*, 103 Ill. 2d 327, 332 (1984) ("Recognizing that the accused typically speaks and acts through his attorney, we have given effect to jury waivers made by defense counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case."). Additionally, "[a]lthough a signed jury waiver alone does not prove a defendant's understanding, it is evidence that a waiver was knowingly made." *Reed*, 2016 IL App (1st) 140498, ¶ 7. Further, a defendant's criminal history can support a finding that he or she knowingly waived the right to a jury trial, because it evidences experience with the criminal justice system. See *People v. Tooles*, 177 Ill. 2d 462, 471 (1997) ("We further observe that defendant's criminal record consisted of four previous convictions, through which he was presumably familiar with his constitutional right to a trial by jury and the ramifications attendant to waiving this right."); *People v. Thomas*, 2019 IL App (2d) 160767, ¶ 19 ("[D]efendant's criminal history bolsters the determination that he understood his rights, based on his experience with the criminal justice system.").

¶ 31    Under the circumstances here, we hold that defendant knowingly and voluntarily waived his right to a jury trial. At defendant's arraignment, the trial court informed defendant that, if he pleaded not guilty, his trial "either could be a bench trial or jury trial." Subsequently, at the final pretrial hearing, defendant was present in court with his counsel. Defendant's counsel presented a

signed jury waiver form and told the court that defendant "executed and informed me that he wishes to waive Jury but go Bench." Defendant did not object or indicate that he had any questions. Accordingly, defendant's "silence while his *** attorney request[ed] a bench trial provides evidence that the waiver is valid." *Reed*, 2016 IL App (1st) 140498, ¶ 7.

¶ 32     The trial court then said, "Let's go through the Waiver," and immediately asked defendant if he signed the jury waiver form. Defendant answered that he did. The court informed defendant that, "if you ask for a trial by the Bench, most likely myself on Monday, and you waive a Jury trial, you waive it forever." Defendant acknowledged that he understood. The trial court asked defendant if anyone threatened him, forced him to sign the waiver, or promised him "anything other than the fact that [he] would not have a jury." Defendant answered, "No, Your Honor." Finally, the trial court asked defendant if he was "doing this of [his] own free will," and defendant answered, "Yes, Your Honor." At no point did defendant ask any questions about the jury waiver or otherwise indicate that he did not understand it. See *Reed*, 2016 IL App (1st) 140498, ¶ 8 (responses to trial court's questioning and absence of any objection or questions from defendant evidenced a valid jury waiver).

¶ 33     Moreover, the record establishes that defendant has a criminal history dating back to 1991, consisting of three misdemeanors and three felonies. The presentence investigation report indicates that defendant pleaded guilty to one of the misdemeanors and that he was last convicted of a felony in 2000. In light of defendant's experience with the criminal justice system, his criminal record supports the conclusion that he understood his right to a jury trial and the consequences of waiving that right. *Thomas*, 2019 IL App (2d) 160767, ¶ 19.

¶ 34     Defendant counters that *Tooles* requires a trial court to explain the differences between a jury trial and a bench trial and to ascertain whether a defendant has consulted with counsel prior

to signing a written jury waiver. Defendant argues that, because the trial court failed to make those "requisite inquiries," his waiver was invalid. Defendant's interpretation of *Tooles* is misguided. In *Tooles*, our supreme court reviewed the trial records in three separate cases to determine whether the defendants had each understandingly waived their right to a jury trial. *Tooles*, 177 Ill. 2d at 469-73. At every trial, the trial court spoke directly to the defendant. *Tooles*, 177 Ill. 2d at 469-72. Defendant Tooles was asked if he understood what a jury trial was and was prompted to explain that concept to the court, which he did. *Tooles*, 177 Ill. 2d at 469. Tooles was also asked if his jury waiver was the product of any promises or threats, and Tooles affirmed that it was not. *Tooles*, 177 Ill. 2d at 470. Defendant Farmer was asked if he understood that, by giving up a jury trial, his case would be heard by the judge sitting without a jury, and Farmer answered that he did. *Tooles*, 177 Ill. 2d at 471. Defendant Gray received an explanation of both a jury trial and a bench trial, and he acknowledged that he understood that, by waiving a jury, his case would proceed as a bench trial. *Tooles*, 177 Ill. 2d at 472.

¶ 35    Our supreme court concluded that all three defendants had understandingly waived their right to a jury trial under the circumstances, referencing the trial courts' admonitions in each case with approval. *Tooles*, 177 Ill. 2d at 470-73. However, the supreme court made clear that whether a jury waiver is made understandingly turns on the facts and circumstances of each case, reiterating the longstanding principle that "no set admonition or advice is required before an effective waiver of that right may be made." *Tooles*, 177 Ill. 2d at 469. Thus, contrary to defendant's claim, *Tooles* sets forth no specific admonition that a trial court must give to render a defendant's jury waiver valid.

¶ 36    Defendant also relies on *People v. Sebag*, 110 Ill. App. 3d 821 (1982), but his reliance on that case is similarly misplaced. In *Sebag*, the defendant was charged with battery and public

indecency. *Sebag*, 110 Ill. App. 3d at 822. The defendant, acting *pro se*, signed a jury waiver form. *Sebag*, 110 Ill. App. 3d at 825, 828. As to the battery charge, the trial court informed him that he could have his case tried before a jury or a judge and that, if he waived a jury, he could not reinstate it. *Sebag*, 110 Ill. App. 3d at 828-29. The appellate court held that the record did not establish that the defendant waived his jury trial right on the public indecency charge, particularly where he was not familiar with criminal proceedings and did not have the benefit of counsel. *Sebag*, 110 Ill. App. 3d at 829. *Sebag* is distinguishable because, here, defendant was represented by counsel at the time of the waiver and his criminal record indicates that he was familiar with criminal proceedings.

¶ 37     This case more closely resembles *Reed*. In *Reed*, the defendant was present with his counsel at several pretrial hearings. *Reed*, 2016 IL App (1st) 140498, ¶ 2. At the hearings, the defendant's counsel told the court multiple times that the trial would be a bench trial, and the defendant remained silent on each occasion. *Reed*, 2016 IL App (1st) 140498, ¶ 2. On the day of trial, the trial court asked whether there would be a bench or a jury trial, and the defendant's counsel answered "bench." *Reed*, 2016 IL App (1st) 140498, ¶ 2. The defendant raised no objection and subsequently informed the court that he signed a written waiver, that he wished to waive his jury right and submit to a bench trial, and that no promises or threats compelled his waiver. *Reed*, 2016 IL App (1st) 140498, ¶ 2. The appellate court concluded that the defendant's waiver was valid. *Reed*, 2016 IL App (1st) 140498, ¶ 8. The court explained that the defendant's silence on every occasion in which his counsel said that they would pursue a bench trial, the presence of the written waiver, and the defendant's responses to the trial court's questioning all evidenced a knowing waiver. *Reed*, 2016 IL App (1st) 140498, ¶ 8. The court also found it significant that the defendant had a prior criminal record, as that evidenced his familiarity with the criminal justice system and his right to a jury trial. *Reed*, 2016 IL App (1st) 140498, ¶ 8.

¶ 38   Here, defendant has failed to establish that his waiver was invalid. Like *Reed*, the record establishes that defendant did not object when his counsel informed the trial court that defendant wished to waive a jury, and at no point did defendant ask any questions or indicate that he did not understand his jury right or the consequences of waiving it. Additionally, defendant's counsel presented a signed jury waiver, which defendant acknowledged signing. Finally, given defendant's prior experience with the criminal justice system, he presumably knew of his right to a trial by jury and the ramifications of waiving that right. We hold that defendant knowingly and voluntarily waived his right to a jury trial, such that the waiver was valid. Accordingly, defendant has not met his burden to show that a clear or obvious error occurred.

¶ 39                              B. Public Place of Accommodation

¶ 40   Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of armed violence, which was predicated on his commission of aggravated battery. Specifically, defendant argues that the State failed to prove the predicate felony of aggravated battery because the State did not establish that he committed a battery "on or about" a "public place of accommodation."

¶ 41   Where a defendant raises a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court "will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48. "A criminal conviction will not be set aside unless the

evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 42    Defendant's sufficiency-of-the-evidence argument involves an issue of statutory interpretation, and such issues are reviewed *de novo*. *People v. Ward*, 215 Ill. 2d 317, 324 (2005). "[T]he cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature." *Ward*, 215 Ill. 2d at 324. In doing so, the court "presum[es] the legislature did not intend to create absurd, inconvenient or unjust results." *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008). "Accordingly, courts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *Christopherson*, 231 Ill. 2d at 454. "The best indication of legislative intent is the statutory language, given its plain and ordinary meaning." *Christopherson*, 231 Ill. 2d at 454.

¶ 43    Here, the State charged defendant with armed violence, which requires the State to prove the commission of a predicate felony. 720 ILCS 5/33A-2(c) (West 2016). The predicate felony alleged was aggravated battery. In relevant part, a person commits aggravated battery when, "in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way, public property, [or] a public place of accommodation or amusement." 720 ILCS 5/12-3.05(c) (West 2016). The State alleged that defendant committed aggravated battery by committing a battery "inside the Shell Gas Station, a public place of accommodation." Defendant argues that the State failed to prove that the battery occurred in a "public place of accommodation" because the offense took place in a "private back office" that was "meant for employees" and, therefore, "inaccessible to the public."

¶ 44    The aggravated battery statute does not define "public place of accommodation." However, in *People v. Ward*, 95 Ill. App. 3d 283 (1981), this court considered the meaning of that language

in examining the applicability of the situs enhancement to a battery occurring inside the victim's car, which was situated in the parking lot of a Holiday Inn. *Ward*, 95 Ill. App. 3d at 285, 287-88. We interpreted the phrase "on or about a public way, public property or public place of accommodation or amusement" broadly, explaining that "the essential allegation" under that language "is that the battery occurred in a public area." *Ward*, 95 Ill. App. 3d at 287. Thus, "[w]hether the property was actually publicly owned and, therefore, 'public property' rather than a privately owned 'public place of accommodation' is irrelevant; what is significant is that the alleged offense occurred in an area accessible to the public." *Ward*, 95 Ill. App. 3d at 287-88; see also *People v. Crawford*, 2021 IL App (5th) 170496, ¶ 60 ("The required question for an aggravated battery under section 3.05(c) 'is whether the area where the offense occurred is accessible to the public.' " (quoting *Blackburn v. Johnson*, 187 Ill. App. 3d 557, 564 (1989))); *People v. Brown*, 2019 IL App (1st) 161204, ¶ 49 (noting that *Ward* "broadly construed the statutory language to encompass any battery committed in a public area"); *People v. Murphy*, 145 Ill. App. 3d 813, 815 (1986) ("[T]he terms 'place of public accommodation or amusement' seem to apply generically to places where the public is invited to come into and partake of whatever is being offered therein."). Our broad interpretation was informed by the legislative purpose behind the situs enhancement language. We explained that our legislature was "[o]bviously *** of the belief that a battery committed in an area open to the public, whether it be a public way, public property or public place of accommodation or amusement, constitutes a more serious threat to the community than a battery committed elsewhere." *Ward*, 95 Ill. App. 3d at 287.

¶ 45    Subsequent cases have embraced *Ward*'s rationale and its broad reading of the aggravated battery statute's situs language. For example, in *People v. Lee*, 158 Ill. App. 3d 1032 (1987), the court held that the language applied to a battery occurring in a parking lot "immediately outside"

a public place of accommodation—a gas station convenience store—in light of *Ward*'s community-harm-prevention rationale. *Lee*, 158 Ill. App. 3d at 1036. Finding *Ward* persuasive, the court agreed that the legislature believed that a "battery committed in an area open to the public constitutes a more serious threat *to the community* than a battery committed elsewhere." (Emphasis in original.) *Lee*, 158 Ill. App. 3d at 1036. Interpreting the statutory language "in light of the harm it was directed at preventing," the court concluded that there was "no logical or reasonable basis *** to distinguish between the premises within the 'public place of accommodation' and the parking lot immediately outside its door." *Lee*, 158 Ill. App. 3d at 1036; see also *People v. Pergeson*, 347 Ill. App. 3d 991, 994 (2004) (battery occurring "about 50 feet outside the entrance doors" of a mall fell under aggravated battery situs language).

¶ 46    Defendant, on appeal, concedes that the "gas station and convenience store were accessible to the public." However, he relies on *People v. Johnson*, 87 Ill. App. 3d 306 (1980), to assert that the office where the battery occurred was not a public place of accommodation, because it was "meant for employees" and, therefore, was "inaccessible to the public." However, we do not find *Johnson* applicable.

¶ 47    In *Johnson*, the First District considered whether a tavern restroom constituted public property or a public place of accommodation or amusement. *Johnson*, 87 Ill. App. 3d at 308. The court held that the intent of the legislature, as expressed by the aggravated battery statute's language, was not to include a tavern restroom under the situs enhancement subsection. *Johnson*, 87 Ill. App. 3d at 308. The court explained that a "tavern is private property open to the public for a limited purpose. To include a tavern restroom within the definition of 'public property or public place of accommodation or amusement' [citation] would not comport with the legislative intent of the statute." *Johnson*, 87 Ill. App. 3d at 308. *Johnson*, however, was decided prior to this court's

decision in *Ward*, which interpreted the situs language more broadly in light of the legislature's intent to prevent harm to the community by enhancing any battery occurring "in an area accessible to the public." *Ward*, 95 Ill. App. 3d at 288. Indeed, in *Ward*, we broadly interpreted "on or about a *** public place of accommodation" to encompass a battery occurring *inside the victim's vehicle*, which was situated in a hotel parking lot. *Ward*, 95 Ill. App. 3d at 285, 287-88. Consequently, we do not find defendant's reliance on *Johnson* persuasive.

¶ 48    Here, on the facts of this case, we hold that the office was a public place of accommodation because it was "accessible to the public." *Ward*, 95 Ill. App. 3d at 288. The office was located inside of a Shell gas station and convenience store. The Shell station itself was a public place of accommodation, where customers were invited inside to buy gas and goods in the convenience store. See *Lee*, 158 Ill. App. 3d at 1034, 1036 (gas station was public place of accommodation). The office was situated in the same hallway that customers had to walk down to access restrooms that were available for customers to use. The office was directly next to the men's restroom, and the door to the office was propped completely open by a kickstand during business hours. Indeed, the evidence established that at least one customer accessed the office. Rooker testified that, after finding no one to help him complete his purchase, he went to the office and discovered Edmonds inside, and surveillance footage established that Rooker entered the office.

¶ 49    We further note that our holding comports with the legislative intent behind the situs enhancement language. Adopting defendant's position that the battery did not occur on or about a public place of accommodation because it occurred in an office "meant for employees" undercuts the legislature's aim to protect the community from batteries occurring in areas open and accessible to the public. Under defendant's interpretation, a battery occurring immediately in front of the Shell gas station's register counter would implicate the situs enhancement, but a battery occurring

immediately behind that same counter would not, simply because it is not an area "meant" for customers, and despite the similar threat to the community that both batteries would pose. See *Lee*, 158 Ill. App. 3d at 1036 (given the legislative intent to protect community from batteries occurring in public, there was no reasonable basis for distinguishing between premises within the public place of accommodation and a parking lot "immediately outside its door"); *Christopherson*, 231 Ill. 2d at 454 (we presume the legislature did not intend to create absurd, inconvenient, or unjust results). The risk of harm to the community is evident here, where the battery occurred in an office located inside of a business establishment open to the public, next to restrooms available for customers to use, and with its door propped completely open during business hours.

¶ 50    Because the office was "an area accessible to the public," we determine that the State presented sufficient evidence to prove that defendant committed a battery on or about a public place of accommodation.

¶ 51                          C. Excessive Sentence

¶ 52    Finally, defendant argues that the trial court abused its discretion in sentencing him to an aggregate 80-year term of imprisonment. Defendant contends that the sentence was excessive because this was his first "significant offense" and because Edmonds suffered only non-life-threatening injuries. This argument is meritless.

¶ 53    The trial court's sentencing decision is entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). When a sentence imposed is within the statutory limits for the offense, it will not be disturbed absent an abuse of discretion. *People v. Garibay*, 366 Ill. App. 3d 1103, 1108 (2006). A sentence is an abuse of discretion where it is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). In determining the

appropriate sentence to impose, a trial court may consider the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects and youth. *Garibay*, 366 Ill. App. 3d at 1109. The weight to be attributed to each factor in aggravation and mitigation depends upon the circumstances of each case. *Garibay*, 366 Ill. App. 3d at 1109. The trial court need not specifically identify and assign a value to each mitigating factor, and the existence of a mitigating factor does not obligate the trial court to impose the minimum sentence. *People v. Adamcyk*, 259 Ill. App. 3d 670, 680 (1994). Instead, we presume that the sentencing court considered the mitigating evidence, absent some indication to the contrary. *People v. Allen*, 344 Ill. App. 3d 949, 959 (2003). Moreover, we must not substitute our judgment for that of the trial court merely because we would have weighed the mitigating factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 54 Defendant was convicted of attempted first-degree murder, a Class X felony punishable by a sentence of 6 to 30 years. 730 ILCS 5/5-4.5-25(a) (West 2016). Because the court found that defendant personally discharged a firearm that proximately caused the victim great bodily harm, it was required to impose a firearm enhancement of imprisonment for an additional 25 years to life. 720 ILCS 5/8-4(c)(1)(D) (West 2016). Defendant was also convicted of armed robbery, which carried a sentence of 6 to 30 years of imprisonment. 730 ILCS 5/5-4.5-25(a) (West 2016). Because the trial court found that defendant personally discharged a firearm that proximately caused the victim great bodily harm, this charge was also subject to a firearm enhancement of imprisonment for an additional 25 years to life. 720 ILCS 5/18-2(a)(4), (b) (West 2016). Additionally, defendant was convicted of armed violence, which carries a sentence of imprisonment for 25 years to 40 years. 720 ILCS 5/33A-3(b-10) (West 2016). Finally, defendant was convicted of unlawful possession or use of a firearm by a felon, a Class 3 felony carrying a sentence of 2 to 10 years. 720

ILCS 5/24-1.1(e) (West 2016). Because the court found that defendant's conduct caused severe bodily injury, the sentence for attempted first-degree murder was required to be served consecutively to the other sentences. 730 ILCS 5/5-8-4(d)(1) (West 2016).

¶ 55    The trial court ultimately sentenced defendant to 45 years of imprisonment for attempted first-degree murder, with that sentence running consecutively to concurrent prison terms of 35 years for armed violence, 33 years for armed robbery, and 5 years for unlawful possession or use of a weapon by a felon, for a cumulative term of 80 years of imprisonment. Each of these sentences was within the statutory limits for the offenses.

¶ 56    Defendant's argument that the trial court should have sentenced him to the minimum total sentence he could have received—62 years—because this was his first "significant offense" and because Edmonds suffered only non-life-threatening injuries is unavailing. Defendant's counsel argued these mitigating factors during sentencing. Counsel claimed that defendant's conduct was the result of circumstances unlikely to recur, because defendant acted under a strong provocation after finding out that Edmonds married someone else. Counsel further claimed that, after defendant's 2000 felony conviction of unlawful possession of a controlled substance, defendant "led a law-abiding life for a substantial period of time." Counsel also noted that the bullet did not penetrate Edmonds's skull and it was removed with relative ease. The trial court considered these arguments and determined that, while defendant's conduct was the result of circumstances unlikely to recur, and while defendant did not have a lengthy criminal history, his conduct was "reprehensible" and "one of the most violent attacks [the court had] ever seen." The trial court noted that defendant had time to contemplate his actions during the drive from East Chicago, Indiana, to Sugar Grove but that he nevertheless carried out the attack. The court further explained that Edmonds "did not walk away from this" and "should be dead," considering that she "had a

bullet literally enter her head." Defendant, in effect, argues that the trial court should have weighed differently the mitigating factors he presented. But the trial court considered these mitigating factors and gave more weight to the severity of the crime and the need to deter others from committing similar acts. This was proper. *People v. Charles*, 2018 IL App (1st) 153625, ¶ 47 ("The most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense."). We see no abuse of discretion in the trial court's assessment of the proper sentence to impose. Accordingly, we will not disturb the trial court's imposition of an aggregate 80-year sentence.

¶ 57                                III. CONCLUSION

¶ 58    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 59    Affirmed.

**No. 2-20-0098**

| | |
|---|---|
| **Cite as:** | *People v. Foster*, 2022 IL App (2d) 200098 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 17-CF-2358; the Hon. Donald Tegeler Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Jean Park, and Miriam Sierig, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |