2026 IL App (2d) 250175-U
No. 2-25-0175
Order filed April 8, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

ERIS ARIMBADO-COBIX, Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Mark R. Gerhardt, Judge, Presiding.
No. 23-CF-523

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant touched the victim while at a large gym, which qualifies as a public place of accommodation for purposes of aggravated battery statute; sufficient evidence proved defendant guilty; trial counsel was not ineffective; and the trial court's decision barring the defense from pursuing a second motion for directed verdict was harmless.

¶ 2    Following a bench trial, the circuit court of McHenry County found defendant, Eris Arimbado-Cobix, guilty of one count of aggravated battery based on the location of the conduct (720 ILCS 5/12-3.05(c) (West 2022)), and one count of grooming (§ 11-25(a)). Defendant appeals, primarily contending that, as a matter of law, a large commercial gym is not a public place of accommodation. He also raises ancillary arguments, too, claiming that the State failed to prove

beyond a reasonable doubt that the battery occurred in a public place of accommodation; defense counsel was ineffective for conceding the location was public place during the trial, and that the trial court erred by refusing to allow him to make a motion for a directed finding on the aggravated battery charge after the court denied his motion for a directed finding on the grooming charge. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On July 20, 2023, defendant was indicted on one count of aggravated battery, based on the battery being committed in a public place of accommodation, and one count of grooming. The charges alleged that defendant took J.P., a minor, to the Lifetime Fitness gym in Algonquin, a public place of accommodation, where he rubbed her leg and upper thigh with his hands.

¶ 5       A bench trial was held on November 26, 2024, and December 18, 2024. The State first called Anthony Scott, the general manager of Lifetime in Algonquin. On direct examination, he testified, in part, as follows:

        "Q. What is Lifetime?

        A. Lifetime is an athletic country club. It is a high[-]end fitness facility. We try to be a one-stop shop for every type of class or activity you might want to participate in for fitness.

        Q. Is there one location or multiple locations?

        A. There are multiple locations. Over 172 nationwide.

        Q. Which location are you the lead general at?

        A. I'm the lead general in Algonquin.

        Q. Is that location in McHenry County, Illinois?

        A. Yes, Ma'am.

Q. In order to use the facilities and attend the classes at Lifetime, does someone need a membership?

A. You need to be a member or a guest of a member.

Q. As to becoming a member, how is someone able to sign up to become a member at Lifetime?

A. You can join online or come into the club and join.

Q. Are there any restrictions on who can or cannot become a member of Lifetime?

A. No.

Q. And you talked about how guests of members are able to use the facilities and go to classes; is that correct?

A. That's correct.

Q. How do guest passes work?

A. It has changed a couple of times. It can be an electronic guest pass that the member sends to a guest, or they can just bring the guest with them and check them in at that time.

Q. Are there any restrictions as to which members can bring guests?

A. They need to be 18 or older to bring a guest.

Q. Are there any restrictions on who can be a guest of a member?

A. No.

Q. Does the member need to be with a guest at all times while at Lifetime?

A. We do request that the sponsoring members stay with the guest.

Q. So on any given day at the Lifetime in Algonquin, there could be both members and nonmembers inside of the facility?

A. That's correct.

Q. Are there restrictions on when someone can sign up to be a member at Lifetime?

A. No.

Q. So it is possible for someone to walk into the club today and sign up to become a member?

A. That's correct."

¶ 6    The State next called J.P. She testified that she was born in December 2009. J.P. was 13 years old on April 29, 2023, when the alleged battery occurred, and 14 years old at the time of the trial. She identified defendant as a family friend and testified to the events of April 29, 2023. She stated that defendant had been coaching her in soccer, with one-on-one training sessions. That day, defendant picked her up from her house and drove her to a park to practice soccer. After they practiced for about 30 minutes, the weather turned rainy and windy. Defendant next drove J.P. to Lifetime, stopping first at his home so he could pick up his swimsuit. J.P. asked defendant to tell her mother about the change in plans, but she did not believe he did so.

¶ 7    After they arrived at Lifetime, they signed in and changed in separate locker rooms. Defendant changed into swimming trunks and a shirt. J.P. had extra clothes in her backpack, but did not have a swimsuit, so she wore a shirt and shorts. J.P. testified that defendant touched and rubbed her legs while they used the lap pool, the leisure pool, and the hot tub. J.P. said, "I told him not to touch me because I don't like when people touch me." Defendant, however, did not stop and it made J.P. feel "unsafe and uncomfortable." They later visited the weight room, where defendant touched and rubbed J.P.'s thigh while she used one of the machines.

¶ 8    While J.P. remained on the stand, the State published surveillance videos from Lifetime, showing J.P. and defendant on the day in question. J.P. identified herself and defendant in various

video clips showing their interactions. One clip showed J.P. hugging defendant. When asked whether defendant asked for the hug, J.P. said yes.

¶ 9　After leaving Lifetime, defendant drove J.P. to Taco Bell and bought food for her, then drove her to a second park where they watched soccer games for about 20 minutes. J.P.'s mother then called defendant to ask when J.P. would be home, so defendant drove her directly home. On cross-examination, J.P. confirmed that the physical contact at Lifetime occurred while other people were around. The surveillance video showed dozens of people in the facility in addition to defendant and J.P.

¶ 10　After the State rested, the defense moved for a "directed finding of not guilty on the count of grooming." After hearing argument from both parties, the court denied the motion. The court then asked, "What would you like to do next?" Defense counsel answered, "Your Honor, if I may be heard on a motion for directed finding on the aggravated battery charge." The court replied, "No. You had your opportunity to make your motion. You chose to pick one of the two counts." Defense counsel raised no objection.

¶ 11　Next, defendant took the stand on his own behalf. He testified that he was 46 years old, married, and employed. His hobbies included playing and coaching soccer. He became friends with J.P.'s mother because she played soccer with him. He had known J.P. since she was a baby and had spent time with her family at birthday parties and other events. He stated that J.P.'s mother asked him to train J.P. in soccer in April 2023, and that the soccer practices were meant to distract J.P. from drugs and suicidal thoughts. He said that, on April 29, 2023, he planned to practice soccer with J.P. in Lake in the Hills and then go to a soccer tournament at a different park. They stopped practicing and went back to the car after it started raining. Next, they went to Lifetime.

¶ 12 Defendant testified that, once they arrived at Lifetime, J.P. saw the waterslides and wanted to go to the pool area. According to defendant, J.P. wanted to get on his shoulders in the pool because she saw other people doing that. Defendant admitted to having physical contact with J.P. two or three times after that. Asked about video footage showing J.P. giving defendant a hug, he said, "I don't know why she throw [*sic*] herself at me."

¶ 13 In closing arguments, defense counsel stated that "there is no dispute that the—that the fitness, the gym, the Lifetime Fitness is a public place." Counsel went on to argue that the physical contact between J.P. and defendant was brief and in a public place, and that it was "contact that may happen between people who have known each other their entire lives and contact that may occur between a coach and somebody that he is training." Counsel emphasized that J.P. did not make accusations against defendant until she got in trouble for having a vape at school. With respect to the grooming charge, counsel argued that there was "no evidence that anything that [defendant] did was somehow related to trying to solicit, lure, entice, or seduce [J.P.]."

¶ 14 Following closing arguments, the court found Lifetime to be a public place of accommodation, noting that both parties agreed on that point. The court stated that J.P.'s testimony was credible, and that the surveillance videos corroborated her testimony. The court found defendant's assertion that the contact occurred within the context of coaching J.P. was not credible. The court concluded, "It is clear to me from the testimony and the video that at Lifetime Fitness the [d]efendant made contact of an insulting or provoking nature with J.P. and that Lifetime was a place of public accommodation, and there is a finding of guilty." The court noted that defendant isolated J.P. before finding defendant guilty of the grooming charge.

¶ 15 On March 28, 2025, the court heard argument on defendant's posttrial motion. Defendant argued that the evidence was not sufficient to prove him guilty beyond a reasonable doubt of

grooming and that the court violated due process when it denied defendant's request to argue a second motion for a directed finding. In response to defendant's second argument, the court stated:

"That argument is basically that his client should have had the opportunity to make a motion for directed finding on [the aggravated battery charge]. I find this argument disingenuous and false. The [c]ourt asked—or [defense counsel] requested, and the [c]ourt allowed, to make a motion for directed finding. [Defense counsel] was not interrupted, and he was not told he could not make any argument he liked. He made an argument. He finished. He was done. [The State] made [its] argument, the [c]ourt ruled, end of story. At that point, [defense counsel] wanted to re-argue, for whatever purpose."

The court went on to state that the relevant statute "does not require what [defense counsel] is suggesting it requires." The court then reiterated some of the evidence supporting the finding of guilt on the grooming charge and denied defendant's posttrial motion.

¶ 16     Following a sentencing hearing, the trial court sentenced defendant to two years' sex offender probation and ordered defendant to register as a sex offender and pay certain fees and fines. Defendant timely appealed.

¶ 17                                    II. ANALYSIS

¶ 18     On appeal, defendant asks this court to reverse his aggravated battery conviction or, alternatively, to reduce the conviction to simple battery, asserting that Lifetime Fitness is not a public place of accommodation as a matter of statutory interpretation. Defendant also argues that: (1) the State did not prove the "public place of accommodation" element beyond a reasonable doubt, (2) his conviction resulted from his attorney's concession that the Lifetime facility qualified as a public place of accommodation, and (3) that the trial court erred in not allowing defense counsel to separately argue for a directed verdict on the aggravated battery offense. All three

- 7 -

arguments are overcome by the same conclusion: for purposes of the aggravated battery statute, the facilities at Lifetime Fitness meet the definition of a public place of accommodation.

¶ 19    To prove aggravated battery, the State must prove the underlying offense of battery as well as one of the additional factors listed in section 12-3.05 of the Criminal Code of 2012 (Code). 720 ILCS 5/12-3.05 (West 2022). In this case, the State proceeded under subsection (c), which states:

> "(c) Offense based on location of conduct. A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship." 720 ILCS 5/12-3.05(c).

Whether a particular location "is a public place of accommodation requires the court to engage in statutory interpretation, which presents a question of law that we must review *de novo.*" *People v. Whitehead*, 2023 IL 128051, ¶ 16.

¶ 20    Defendant argues that Lifetime Fitness is not a public place of accommodation or amusement because it is "a membership-only health club[,]" and access to the facility "is limited to paying members and their guests." Defendant further argues that "[u]nlike a sidewalk, park, or retail store, [Lifetime] is not a venue where any member of the community may freely enter and partake" of its facilities. Thus, according to defendant, a membership model dictates that the facilities available within Lifetime Fitness—such as the swimming pool and weight room—are not a public place of accommodation under section 12-3.05(c) of the Code. We disagree.

¶ 21    Recently, in *Whitehead*, our supreme court addressed a similar statutory claim. The court noted that the purpose of section 12-3.05(c) is to punish more seriously and thereby deter the

- 8 -

battery from being committed in spaces open to the public. *Whitehead*, 2023 IL 128051, ¶ 23. Ultimately, the court concluded that the stoop in front of an apartment building was not a public place of accommodation, stating that, while "[m]embers of the general public may use the stoop in limited circumstances, *** the stoop is for the convenience of the private owner of the residence to access his or her residence." *Id*. ¶ 29. "The fact that certain members of the public may access the stoop is secondary to [its] purpose." *Id*. ¶ 22.

¶ 22    An apartment stoop, however, is more private in the colloquial sense than, say, the facilities inside a large commercial gym. Relevant here, Illinois courts have "consistently interpreted 'a public place of accommodation or amusement' to mean a place made available to the public." *Id*. ¶ 27. This would include most businesses, which are typically private entities operating on private property that are open to the public. But this may also include an area *inside* of a business, such as a staff-only office inside of a store. *Id*. ¶ 28 (citing *People v. Foster*, 2022 IL App (2d) 200098, ¶ 48). Even though that office area is not ordinarily meant for the public to walk through, it nevertheless qualifies under section 3.05(c) so long as it is a space "associated with a business [that] provide[s] some good or service that met a need or offer[s] a convenience to the general public." (Internal quotation marks and citations omitted) *Id*. ¶ 28. We also need not be unduly technical about the nature of the business at issue. As the supreme court noted, a tavern, for example, qualifies as a public place of accommodation or amusement even though it was open only to "a *portion* of the public—specifically, adults and not minors[.]" (Emphasis added.) *Id*. ¶ 27 (citing *People v. Logston*, 196 Ill. App. 3d 96, 100 (1990)).

¶ 23    In light of the foregoing, we reject defendant's interpretation of section 12-3.05(c). The facilities at a members-only gym are indeed a public place of accommodation or amusement. Even though it offers memberships, Lifetime Fitness is a business that is open to the public, that offers

its good and services to the public, not just to those that are already members. At trial, the general manager affirmed that there are no restrictions on "who can or cannot become a member of Lifetime," so anyone "can join online or come into the club and join" at any time. Further, any member who is 18 years old or older can bring a guest, and there are no restrictions on who can use the facilities as a guest.

¶ 24    This is hardly different than how public accommodations are understood in other legal contexts. As noted by the State, the Illinois Human Rights Act identifies numerous examples of places of public accommodation, including "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation." 775 ILCS 5/5-101(A)(13) (West 2022). Similarly, the Civil Rights Act of 1964 lists a number of examples of places of public accommodation, including "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment" that serves the public. 42 U.S.C.A. § 2000a(b)(3). And the phrase "public accommodation" is defined in terms of 12 extensive categories in the Americans with Disabilities Act of 1990. 42 U.S.C.A. § 12181(7); see, *e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001) (discussing the private club exception). These state and federal statutes are by no means coextensive with section 12-3.05(c) of the Code. But these examples demonstrate that limiting access to paying customers, or members who pay dues, is a common—indeed, necessary—practice among certain types of businesses, which are nevertheless public places of accommodation, subject to the laws and regulations that apply to public spaces.

¶ 25    We also find the contrary view to be unavailing. A battery in Lifetime's more public-facing areas—such as the parking lot, the vestibule, or the lobby—is not somehow more public or more serious than a battery that occurs just past the front desk. The same is true of a country club, where insulting or provoking contact is no less public or serious because it occurs on the golf course

- 10 -

rather than in the pro shop. See, *e.g.*, *Whitehead*, 2023 IL 128051, ¶ 27 (" '[w]e see no logical or reasonable basis for interpreting the language of this subsection so as to distinguish between the premises within the 'public place of accommodation' and the parking lot immediately outside its door' ") (quoting *People v. Lee*, 158 Ill. App. 3d 1032, 1036 (1987)). Here, the location where the battery occurred was "associated with a business" that is open to the public (*Whitehead*, 2023 IL 128051, ¶ 28), even if it primarily serves only a "portion of the public" (*id.* ¶ 27). Accordingly, we have little difficulty concluding that Lifetime Fitness is a public place of accommodation under section 12-3.05(c) of the Code.

¶ 26     Defendant's remaining arguments are unpersuasive. The State's evidence was sufficient such that a reasonable trier of fact could determine that defendant made insulting or provoking contact in a public place of accommodation. See *Jackson v. Virginia,* 443 U.S. 307, 315-16 (1979); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). Similarly, defendant's counsel was not ineffective for conceding that Lifetime Fitness was a public place of accommodation in closing argument. As we have said, the State presented sufficient evidence on that element of the offense, and there is no reasonable probability defendant would have been acquitted on that basis absent counsel's statement. See *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). And finally, we determine that the trial court did not err when it refused to grant defense counsel an opportunity to present a "second" motion for directed verdict. It is obvious from the comments on record that there was a miscommunication between defense counsel and the trial court judge. We note that counsel did not make a contemporaneous objection, so the issue is forfeited. See *People v. Johnson*, 2025 IL 130447, ¶¶ 27-28 (failure to make trial objection to directed-verdict procedure forfeits issue, even when raised in post-trial motion). We note, too, that defendant does *not* argue the issue as plain error on appeal. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) ("when a defendant fails to

present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review"). Regardless, we determine that any error was harmless beyond a reasonable doubt. Again, there was no reasonable probability that counsel's argument for a directed verdict would have resulted in a different outcome on the aggravated battery charge.

¶ 27                                    III. CONCLUSION

¶ 28     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 29     Affirmed.