2024 IL App (1st) 221481-U

No. 1-22-1481

Order filed September 30, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 00 CR 26121 |
| ROBERTO O'CAMPO, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Marc W. Martin, |
| | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*: Defendant's constitutional challenges to his discretionary 35-year sentence were meritless, and the trial court did not abuse its discretion or improperly consider factors at sentencing. Defendant's trial counsel was not ineffective, and there was no plain error. This court affirmed the decision of the circuit court.

¶ 2     Following a jury trial, defendant Roberto O'Campo was found guilty of first degree

murder, intentional homicide of an unborn child and aggravated unlawful use of a weapon

(AUUW), offenses committed when he was age 17. Following a juvenile resentencing hearing, conducted pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny, defendant was sentenced to 35 years' imprisonment on the first degree murder and intentional homicide of an unborn child convictions, to be served concurrently. Defendant now appeals, contending the trial court relied on an unconstitutional sentencing range and failed to consider mitigating factors in accordance with section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2022)), leading to an excessive sentence. We affirm.

¶ 3                                       BACKGROUND

¶ 4      Defendant was arrested for the above-stated offenses after it was discovered that he shot his former girlfriend, Angelica Bailon, who was then age 18 and six months pregnant by another man reportedly named Victor.[1] She was also a single mother to a young child. At trial, the State adduced evidence that on October 4, 2000, defendant went to Bailon's workplace two times in the afternoon, argued with her in Spanish and allegedly took her cell phone. In the early evening, the two left the office together. Several hours later, around 7:30 p.m., the two were outside near an apartment complex with some friends. They departed from the group, retreating behind some buildings, where shortly thereafter, defendant shot Bailon causing her death and that of her unborn child. Medical evidence showed she was shot by a single bullet to her right chest from a distance of two or more feet. The bullet traveled front to back and in a downward motion. The gun was discovered hidden under rocks in a park. Police later found defendant hiding in an electrical closet in his parents' apartment complex.

¶ 5      Defendant was taken into custody on October 5. Defendant stated the couple had been in an on-again-off-again relationship for some 6 months, but just two weeks prior, Bailon had

---

[1]Defendant was on juvenile probation at the time of these offenses.

broken up with defendant. Defendant at first claimed the shooting was an accident and the gun simply "went off." However, defendant ultimately admitted that he took Bailon's phone, he refused her request to return it, and after arguing, he pulled out both the phone and the gun from his pockets, then pulled the slide back, showing Bailon a bullet in the gun and said "this bullet is for Victor." (Another witness overheard Bailon ask defendant about her phone before the two retreated.) Defendant stated he was angry because Bailon was involved with him when she became pregnant by Victor. Defendant admitted pointing the gun at Bailon, pulling the trigger, and shooting her. Defendant said he did not know what he was thinking.

¶ 6      The State further presented evidence by a forensic scientist focused on firearms identification that the loaded gun used in this shooting had a thumb safety. Testing showed the gun was in proper operating condition and, with the thumb safety on, it would not simply "go off" if dropped. Instead, firing the gun required pushing down the safety and a finger on the trigger with between 5 and 5.5 pounds of pressure, within normal range.

¶ 7      Defendant presented several witnesses and testified on his own behalf. One witness stated he saw defendant point the gun at his own head after the shooting. Defendant denied intentionally shooting Bailon or her unborn child. He testified that immediately after it, he attempted to call 911 but could not get through.

¶ 8      However, as set forth, the jury rejected the defense and found defendant guilty of first degree murder, intentional homicide of an unborn child, in addition to AUUW. At the 2002 sentencing hearing, the State recommended consecutive sentences totaling 82 years (a firearm enhancement was not at issue). Although before *Miller*, the sentencing judge took into account defendant's age and rehabilitative potential and sentenced defendant to a concurrent term of 45

years' imprisonment on the convictions for first degree murder, served at 100 percent, and intentional homicide of an unborn child, served at 85 percent, with the UUW counts merging.

¶ 9    Defendant filed a direct appeal claiming the jury was improperly instructed, resulting in an unfair trial. This court affirmed defendant's conviction. *People v. O'Campo*, No. 1-02-1740 (May 17, 2004) (unpublished order under Illinois Supreme Court Rule 23); see also *People v. O'Campo*, 212 Ill. 2d 547 (2004) (denying leave to appeal). Defendant thereafter filed a number of unsuccessful collateral challenges, again maintaining the shooting was an accident.

¶ 10    In July 2017, defendant filed his third postconviction petition claiming his 45-year sentence violated the Eighth Amendment under *Miller* and was unconstitutional. The trial court granted leave to file the successive petition, and with the aid of counsel, defendant filed an amended petition. Under the law then in effect, the State conceded defendant was entitled to a new sentencing hearing. The postconviction court thus granted defendant's petition and ordered an updated presentence investigation report.

¶ 11    The resentencing hearing took place on September 23, 2022. The State presented the victim impact statement of Bailon's mother, Isabel Bahena, which also was introduced at the original sentencing hearing in 2002, and those of the Bailon's two sisters. In Isabel's statement, she noted that defendant's parents wished her to say the shooting was "an accident," but she knew only that she would never see her daughter again. The victim's two sisters read their statements into the record. Carolina Bahena, the older sister, stated defendant's original sentence was appropriate, in that "the punishment fit the crime," and that being present at the resentencing hearing was "like pouring salt in our wound." She then described the value of Bailon, "a beautiful victim inside and out," and her "best friend." She directly addressed defendant, asserting that the shooting of Bailon was no accident and the attempts by his family to convince

4

hers otherwise were "disgusting." She asserted that defendant's family harassed hers for months before trial. She stated that she and her mother struggled with mental illness as a result of defendant's actions. Elizabeth Bailon, the younger sister, stated that "having to relive this pain is like reliving the nightmare that changed" her family and left her with an emptiness and a "constant lump" in her throat. She described the victim as her second mom, a role model, and careful person. Defendant robbed the victim Bailon of the opportunity to raise her children and see their milestones.

¶ 12    The State also submitted defendant's prison disciplinary records, which reflected a number of rule violations, and highlighted defendant's jail violations. In 2001, defendant and a cohort of detainees stole commissary items from two inmates after beating them, such that the victims required medical attention. Defendant stood by, gave the orders for the beatings, then he stole the items. Defendant also was found with and admitted having homemade knives in his personal mail while incarcerated. Other prison infractions involved unauthorized possession of contraband, homemade alcohol in 2012, and, in 2013, gang activity, wherein defendant attempted to "hand off a homemade weapon" to another inmate for the Latin Folks Nation to use. Defendant was found in possession of a cell phone and had posted social media photos of himself making gang signs. As late as 2021 and 2022, defendant was found guilty of unauthorized movement, abuse of privileges specifically related to the phone, and rules violations.

¶ 13    The State further noted discrepancies in defendant's presentence investigation reports. In his original 2001 presentence investigation report, defendant reported having a "normal childhood with no alcohol/drug abuse and no emotional, physical, or sexual abuse or neglect

noted."[2] None of his family members had a substance abuse problem, and while defendant used alcohol, marijuana, and cocaine in his mid-teens, he denied a substance abuse problem. Defendant reported that "he never ran away from home" and his home was in a " 'kinda nice' neighborhood." In contrast, the updated resentencing reports emphasized that defendant had an alcoholic father who physically and emotionally abused him and threw him out of the home. They depicted his neighborhood as corrupt and gang-filled. The updated presentence investigation report noted that, according to law enforcement data, defendant "is identified as a member of the Spanish Gangster Disciples Street Gang" and he had self-reported previous membership. Defendant, however, denied any current affiliation.

¶ 14    The presentence investigation reports and record also revealed defendant's juvenile delinquency history. It included drug possession, criminal damage to property, theft, and in one instance, defendant and two other offenders grabbed a victim, wrestled him to the ground, and beat him, then stole the victim's wallet and payroll check. Defendant was found delinquent for that battery and robbery in 2001 and committed to the Department of Corrections.

¶ 15    In mitigation, defendant submitted letters of support from his mother, nine friends, and a retired correctional counselor, Karen Rabideau, who described defendant as polite, respectful, sincere, and desiring to better himself. She added that he was a "model offender." Defendant also submitted a mitigation report, dated August 2022, showing his social background history and involvement in gangs, drugs, and juvenile cases during his teenage years. Yet, while in prison, defendant had obtained his GED and completed barber school, tutored other inmates, and earned 54 college credits (just shy of an associate's degree), earning As and qualifying on six

---

[2]According to the original presentence investigation report, defendant "declined to sign Release of Information forms for verification, therefore, family members could not be contacted." Accordingly, the information was provided primarily by the then 17-year-old defendant.

President's List certificates for receiving a 4.0. He worked as a janitor, cell house worker, and barber (earning a certificate) and also aided nurses in caring for disabled people and in 2020, during Covid. Yet, he was also housed in a cell house for high-aggression inmates and remained there two years. In the mitigation report, defendant still maintained the shooting was an accident.

¶ 16    At the hearing, defendant called his friend and Bailon's cousin, Roberto Flores Bahena, who testified for the first time that he believed the shooting was "without a doubt" an accident. Roberto witnessed defendant and Bailon as a couple and stated that if defendant really wanted to do something, he "had her in his house," where Bailon frequently slept. After the shooting, Roberto witnessed defendant's face, and "he didn't look like he wanted to kill. He was remorseful." Roberto added that defendant had since physically, emotionally, and mentally evolved into maturity. Roberto stated that defendant was remorseful and should not have to spend 45 years in prison for a crime "he didn't intend to do." At the hearing, defendant also called a childhood friend and neighbor who testified that defendant would spend time at her home after his father kicked him out. She witnessed abusive behavior by defendant's father. She testified defendant carried a gun for protection against older gang members. His growth in prison and focus on education and his trade was a transformation. Another childhood friend who described defendant as "family" read her letter into the record, stating that he was a family-oriented person who sought to better society and his life with his GED and job. She emphasized that he had overcome a difficult background with no education. She stated the only thing he was guilty of "was being in the wrong spot at the wrong time" and stated the crime was not intentional.

¶ 17    Jose Velazqo, defendant's friend from prison, testified that they met when Velazqo was incarcerated and had known each other 24 years. (Velazqo had since been released with the help

of Northwestern's innocence project). Defendant was like family to Velazqo and a positive influence in his life; he helped Velazqo enroll in school and leave gang life. Defendant had matured and Velazqo believed defendant would help other inner city kids learn from his story. Velazqo wished to work alongside defendant as a barber.

¶ 18 Last, defense counsel highlighted the aforementioned letter from Rabideau, the retired corrections officer.

¶ 19 Following this hearing evidence, the State argued in aggravation that defendant's crimes were egregious, he was the only responsible party, and the shooting was intentional, according to both the direct evidence involving the gun and defendant's admissions. The State pointed to defendant's repeated attempts to absolve himself from responsibility for the crimes, his inconsistent presentence investigation reports, his significant juvenile history, including the battery and robbery for which defendant was committed to the Department of Corrections, and his subsequent misconduct during incarceration. The State argued defendant's sentence was fair and commensurate with the seriousness of the offenses.

¶ 20 The defense argued alternatively that the *Miller* factors, including defendant's young age of 17, his impetuosity, and his ability to consider risk, warranted a lesser sentence. The defense asserted that defendant carried the gun for protection, which qualified as outside pressure, and he was thrown out of the house by his father. The defense argued defendant accepted responsibility for the poor choices he made leading up to the offenses and also for Bailon's death. The defense maintained the prison rule infractions did not support that defendant "is gang involved" and defendant had not engaged in violence during his incarceration, but rather, had tried to better himself. Defendant's extensive rehabilitation included work, supporting himself financially in prison, learning the skill of being a barber, and educating himself. The defense pointed to

Rabideau's letter of support, noting she found defendant polite and respectful. The defense argued that notwithstanding the witnesses' testimony to the contrary, defendant respected the jury's first degree murder finding.

¶ 21     In allocution, defendant expressed that he was sorry for his actions and regretted having a gun. If he could go back, he "never would have harmed" Bailon "in any way." Because defendant did have the gun, he lost "the only person in this world that cared about" him. Defendant asked for forgiveness from Bailon, his family, and hers.

¶ 22     The court sentenced defendant to 35 years in prison, reducing his sentence by 10 years, with credit for 8024 days for time served. The court first recited the facts of the case, noting the jury had found defendant guilty of first degree murder, thus rejecting his accident defense. The court stated that it did "not discount," nor "disagree with the jury's findings of intentional conduct" but did "disagree with the comments this afternoon that the defendant was in the wrong place at the wrong time and that this was an accident." The court also noted the original sentence. The court then stated that by virtue of the resentencing with parole, defendant would have a meaningful opportunity for release before serving 40 years in prison. See 730 ILCS 5/5-4.5-115(b) (West 2022). The court announced that it had reviewed the entire trial record, including the original sentencing hearing transcript, the direct appeal order, the original and amended presentence investigation reports, defendant's character letters, mitigation report, prison records, and the victim impact statements. The court had also listened to both parties' arguments, defendant's allocution statement, and the hearing testimony. The court stated it had considered the statutory factors in mitigation and aggravation (absent the harm caused, inherent in the offenses), defendant's age of 17, the nature of the offense, and the background history and character of defendant.

¶ 23    The court identified on the record the factors delineated in section 4.5-105 of the juvenile sentencing statute (730 ILCS 5/5-4.5-105 (West 2022)), again considering defendant's juvenile status; his impetuosity in firing a single shot, which was "rash, arbitrary, and impulsive," notwithstanding defendant's intentional conduct in shooting Bailon; his maturity, showing there were no cognitive or developmental delays and, being 17, he was on the upper end of the juvenile status; his commission of the offense on his own, apart from the negative influences in his life or peer pressure; and his family background (noting the discrepancies in the two presentence investigation reports).

¶ 24    As for defendant's rehabilitation, the court noted the letter of recommendation from Rabideau, the corrections counselor, identifying defendant as a "model inmate," defendant's barber college, and his educational advancement, in addition to his lack of prison fights, escape attempts, or later violence. This was balanced against his proclivity for aggressive behavior that had apparently waned over 20 years, his self-admitted status as a gang member, and his incarceration infractions, including the two more serious infractions, possession of a cell phone in 2012, social media postings, and the weapon handoff in 2013. The court continued, considering defendant's meaningful participation in his defense, which included his own testimony and no complaints as to legal representation; his substantial juvenile criminal history, including the aggravation testimony adduced at the original sentencing hearing; and defendant's "sincere" expression of remorse ("The Court *** is convinced that if the defendant could take back his actions, he would; that of course is impossible").

¶ 25    As to the circumstances of the offense, the court found that factor did "not weigh in the defendant's favor. This was a very serious offense involving the death of a young person and her unborn child." As to defendants degree of participation in the offense, the court found that factor

10

was "not mitigating," noting: "The jury rejected the defendant's accident defense. The offense occurred because the defendant possessed a handgun in violation of the law. No other person aided and abetted the defendant in the shooting." Last, the court noted that defendant had "received a break" on his original sentence, obtaining one well below the "82 years requested by the State." The court agreed with the original sentencing judge's reasoning and considerations. Yet, the court noted it now had a "first-hand opportunity to consider evidence of actual rehabilitation," and there was some evidence of rehabilitation in the record. The judge therefore sentenced defendant accordingly to a concurrent term of 35 years' imprisonment on the first degree murder and intentional homicide of an unborn child convictions, with the UUW counts merging. As stated, this sentence was 10 years below the original.

¶ 26     Defendant filed a motion to reconsider. In addressing it, the court noted that defendant's original sentence was discretionary, not mandatory, and did not even amount to a life sentence. It was pursuant to the State's concession that defendant received a new sentencing hearing even though defendant arguably was not entitled to one. Moreover, while defendant was subject to consecutive sentences for the two offenses, he received concurrent sentences. Last, given his resentence and the fact that he had already served at least 20 years, defendant was eligible to apply for parole. Accordingly, the court rejected defendant's motion to reconsider, and this appeal followed.

¶ 27                                    ANALYSIS

¶ 28     Defendant now challenges his convictions resulting from the resentencing. This case begins with our Supreme Court's *Miller*. *Miller* held that mandatory life without parole for juveniles under 18 at the time of their crimes violates the eighth amendment's prohibition against cruel and unusual punishments. 567 U.S. at 465, 479. On the heels of that, the Illinois supreme

court has held that *Miller* and its progeny apply to defendants who committed offenses as juveniles and were sentenced to mandatory life sentences, whether natural or *de facto*, and where the sentencing court failed to consider their youth and its attendant characteristics when imposing the sentence. *People v. Clark*, 2023 IL 127273, ¶¶ 71-72; *Buffer*, 2019 IL 122327, ¶ 27. Notably, a sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence. *Clark*, 2023 IL 127273, ¶¶ 72; *Buffer*, 2019 IL 122327, ¶ 41; see also *People v. Dorsey*, 2021 IL 123010, ¶¶ 54, 65 (taking into consideration the juvenile defendants' earliest opportunity for release to assess whether a *de facto* life sentence has been imposed).

¶ 29    Defendant contends he was denied a fair sentencing hearing because the trial court considered an incorrect sentencing range between 20 to 60 years when imposing his sentence. He claims the range was instead 20 to 40 years, arguing that "any sentence *of 40 years or more* would violate the Eighth Amendment and Illinois proportionate penalties clause," and is contrary to *Miller* and its progeny. (Emphasis added). See Ill. Const. 1970, art. I, § 11. Defendant reasons that the sentencing range (including the *possibility* of a *de facto* life term) and parole provisions do not provide a meaningful opportunity for release. He requests that we reduce his sentence or remand for resentencing.

¶ 30    The State responds that defendant has forfeited his claim. Although defendant maintains on appeal that he preserved this sentencing error, he fails to cite the record in support. See Ill. S. Ct. R. 341(h)(7) (eff. ) (Oct. 1, 2020) (an argument shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on). Here, the State argued at resentencing that the range was 20 to 60 years, and defendant did not dispute that point or argue that the trial court had incorrectly determined the range. Also, defendant did not include the sentencing range issue in his motion to reconsider his sentence,

which argued only that his sentence was excessive and omitted mention of the eighth amendment or proportionate penalties clause. However, in order to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required. *People v. Harvey*, 2018 IL 122325, ¶ 15; *People v. Bannister*, 232 Ill. 2d 52, 76 (2008). Accordingly, defendant forfeited his claim.

¶ 31    Likewise, we question whether defendant's constitutional challenges are ripe for review given that he did not receive a *de facto* life sentence and that he does not specifically contend his 35-year sentence was unconstitutional. See *Cheffer v. Reno*, 55 F. 3d 1517, 1523 (11th Cir. 1995) ("Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine"); *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 70 ("like the eighth amendment, the proportionate penalties clause does not apply unless a penalty has been imposed").

¶ 32    Forfeiture and ripeness concerns aside, defendant's claim conclusively fails on the merits for several reasons. First, both offenses carry a baseline statutory sentencing range, absent the discretionary firearm enhancements, of 20 to 60 years. See 720 ILCS 5/9-1.2(d) (West 2022) (a sentence for intentional homicide of an unborn child "shall be the same as for first degree murder"); 730 ILCS 5/5-4.5-20(a) (West 2022) (a sentence for first degree murder is 20 to 60 years); 730 ILCS 5/5-4.5-105(e) (West 2022); 730 ILCS 5/5-4.5-105(e) (West 2022). We generally defer to the legislature's wisdom in setting sentences because it is institutionally better equipped "to gauge the seriousness of various offenses and to fashion sentences accordingly." *Buffer*, 2019 IL 122327, ¶ 35. Also, where, as here, the juvenile sentencing statute was enacted after *Miller*, we presume that the legislature acted with knowledge of the prevailing case law. See *Id*.

13

¶ 33      Second, to the extent defendant suggests that *Buffer*, 2019 IL 122327, imposed a 40-year cap on juvenile sentences, he is incorrect. *Buffer* did not impact existing statutory sentencing ranges. The supreme court in *People v. Webster*, 2023 IL 128428, recently made this abundantly clear. There, the court held that the defendant was subject to a 20-to-60-year sentencing range for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2012)), plus a firearm enhancement, and affirmed the trial judge's 40-year sentence on his conviction. The court reasoned the trial judge still had the discretion under *Miller* "to impose a *de facto* life sentence in excess of 40 years, so long as the trial judge considered defendant's age, as well as the circumstances of the murder." *Webster*, 2023 IL 128428, ¶ 19; see also *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 32 (same). The *Webster* court thus expressly rejected the same argument defendant now asserts, that a 40-year sentence is the longest that can be constitutionally imposed on a juvenile offender under *Buffer*. See also *Merriweather*, 2022 IL App (4th) 210498, ¶ 31 (rejecting the defendant's claim that the sentencing range was 20 to 40 years). The court noted *Buffer* "simply addressed when a juvenile defendant's prison term is long enough to be considered a *de facto* life sentence." *Webster*, 2023 IL 128428, ¶ 23; *Buffer*, 2019 IL 122327, ¶ 41 ("We hereby conclude that a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment").

¶ 34      Relatedly, defendant appears to argue that the legislatively-mandated sentencing range of 20-to-60 years required the trial court to make a finding that he was "permanently incorrigible." However, trial courts are not required to make findings of fact regarding a juvenile's permanent incorrigibility or issue on-the-record sentencing explanations with an implicit finding of permanent incorrigibility *even* before imposing a discretionary life-without-parole sentence on a murderer under 18. *Jones v. Mississippi*, ⎯⎯ U.S. ⎯⎯, 141 S. Ct. 1307, 1318-21 (2021). Our

14

supreme court in *People v. Wilson*, 2023 IL 127666, ¶ 42, expressly followed *Jones*, stating "additional findings are not required, in that a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is 'constitutionally sufficient ( *Jones*, 593 U.S. at ——, 141 S. Ct. at 1313).' " *Id*. *Wilson* thus overruled *People v. Holman*, 2017 IL 120655, ¶ 46, which held the contrary.[3]

¶ 35    Defendant's 35-year concurrent sentence therefore was well within the range of 20 to 60 years for first degree murder and intentional homicide of an unborn child. See *Miller*, 567 U.S. at 465 (applying only to those under 18 who receive *mandatory life without parole*); *People v. Williams*, 2021 IL App (3d) 190298, ¶¶ 20, 28 (a 45-year sentence cap attendant to the defendant's plea for first degree murder committed as a juvenile was not *per se* unlawful or unconstitutional). In short, defendant's sentence was discretionary, defendant did not receive a mandatory life sentence or a *de facto* life sentence, and he is subject to parole, which offers him a meaningful opportunity for release before serving his full sentence. See *People v. Anderson*, 2024 IL App (1st) 22086, ¶ 14; *People v. Cavazos*, 2023 IL App (2d) 220066, ¶¶ 35, 64; *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56; *cf. People v. Gates*, 2023 IL App (1st) 211422, ¶¶ 47-49 (parole does not offer a meaningful opportunity for release). This sentence and the range it carried did not violate the eighth amendment. See *id*.; *People v. Clark*, 2023 IL 127273, ¶ 72 (the reasoning in *Miller* does not apply to discretionary life sentences).

¶ 36    For these same reasons, defendant's state proportionate penalties claim must fail. See *Cavazos*, 2023 IL App (2d) 220066, ¶¶ 35, 64 (rejecting proportionate penalties argument where the defendant has the opportunity for parole); *Elliott*, 2022 IL App (1st) 192294, ¶ 56 (same); see

---

[3]*Wilson* was filed May 18, 2023, just before defendant's brief was filed on May 25, 2023. Given defendant's argument on the incorrigibility finding, presumably he did not take *Wilson* into account when he filed his brief.

also *People v. Hilliard*, 2023 IL 128186, ¶¶ 27-28 (and cases cited therein) (cautioning against relying on *Miller*-based cases to argue an as-applied proportionate penalties claim, where those cases were specifically directed at mandatory life sentences). We also agree with the State that a sentence range including more than 40 years is not so cruel, degrading, or so wholly disproportionate to the offenses of first degree murder and intentional homicide of an unborn child as to shock the moral sense of the community. See *Clark*, 2023 IL 127273, ¶¶ 51, 72. Defendant, regardless, does not cite legal authority for his specific proportionate penalties claim, thus forfeiting the matter. See Ill. S. Ct. R. 341(h)(7) (eff. ) (Oct. 1, 2020); *People v. Pope*, 2020 IL App (4th) 180773, ¶¶ 75, 77.

¶ 37   Defendant's claim that Illinois' youth parole statute does not provide a meaningful opportunity for release, rendering his sentence unconstitutional, also fails. Section 5-4.5-115(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-115(b) (West 2022)) provides:  "A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences[.]" *Id*. Section 5-4.5-115(m) further provides that if a defendant serving a sentence for first degree murder is then denied parole, he may apply again 10 years after the Prisoner Review Board's written determination issues. 730 ILCS 5/5-4.5-115(m) (West 2022). Defendant contends this 10-year interval is too long compared to other states' parole provisions and the limit on just two parole applications is too harsh. He argues the statute violates *Miller*. He adds, for example, that the statute does not take into account juvenile offenders' special characteristics or youth under *Miller*, and the administrative rules require the Board to consider risk assessments designed for adults, not children.

¶ 38    Defendant's discretionary 35-year sentence renders his entire argument moot under

*Miller*. Notwithstanding that fact, these same arguments on parole were presented to this court in

*Cavazos*, 2023 IL App (2d) 220066, ¶¶ 50-60, which extensively considered them and, in a

thorough and reasoned decision, rejected them. The court concluded the parole statute requires

the Prisoner Review Board to consider youth-related factors implicated in *Miller* and provides a

meaningful opportunity for release. *Id*. ¶ 56; see also 730 ILCS 5/5-4.5-115(j) (West 2022);

*People v. Guerrero*, 2022 IL App (1st) 210400, ¶ 33. We see no reason to depart from *Cavazos*.

We would add that generally offenders sentenced for murder under the parole statute and new

juvenile sentencing law, as was defendant, can never have a *Miller* violation because the parole

statute mandates that these defendants have an opportunity for release. See *Montgomery v.

Louisiana*, 577 U.S. 190, 212 (2016) ("A State may remedy a *Miller* violation by permitting

juvenile homicide offenders to be considered for parole, rather than by resentencing them").

¶ 39    Defendant next contends that the court failed to consider mitigating factors in accordance

with section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2022)), leading to an excessive

sentence. Defendant specifically argues the court failed to consider in mitigation his degree of

participation in the offense and the circumstances of the offense and instead considered these

factors in aggravation. He again asks that we reduce his sentence or remand for a new sentencing

hearing.

¶ 40    We agree with the State that defendant has forfeited these specific contentions. See

*Harvey*, 2018 IL 122325, ¶ 15; *Bannister*, 232 Ill. 2d at 76. However, regardless, his claim has

no merit. Consistent with *Miller* and its progeny, section 5-4.5-105 of the Code (730 ILCS 5/5-

4.5-105 (West 2022)) now requires a sentencing judge to consider additional mitigating factors at

the sentencing hearing of an under-18 offender. See also *Buffer*, 2019 IL 122327, ¶ 46. Section

5-4.5-105(a) "does not replace the normal sentencing provisions but supplements them." *Merriweather*, 2022 IL App (4th) 210498, ¶ 31; 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2022). The additional factors include the offender's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and whether a cognitive delay or disability is present; whether the offender was subjected to outside pressure by peers, family, or other negative influences; the offender's family, home environment, educational, and social background; the offender's potential for rehabilitation and evidence of rehabilitation; the circumstances of the offense; the offender's degree of participation in the offense; whether the offender meaningfully participated in his defense; the offender's juvenile or criminal history; and any other information the court finds relevant and reliable, including an expression of remorse. 730 ILCS 5/5-4.5-105(a) (West 2020); see also *Holman*, 2017 IL 120655, ¶ 46 (identifying factors).

¶ 41 Contrary to defendant's contention otherwise, while section 5-4.5-105 of the Code requires the trial court to consider the identified factors in mitigation, it does not require the court to find every factor *to be mitigating*. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 31 ("not all mitigating factors may apply in every case"); see also *People v. Chapman*, 194 Ill. 2d 186, 252-53 (2000) (a sentencing court is not required to accept a defendant's characterization of evidence as mitigating and may treat it instead as aggravating); *cf. People v. McKinley*, 2020 IL App (1st) 191907, ¶ 88 (noting, the factor involving peer pressure and negative influences must always be mitigating in light of *Miller*). The weight attributed to each factor depends on the circumstances of the case, and no single factor is dispositive. *People v. Lusby*, 2020 IL 124046, ¶ 35; *People v. Foster*, 2022 IL App (2d) 200098, ¶ 53.

¶ 42 Moreover, a trial judge is presumed to have based its sentencing determination on proper legal reasoning. *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 67; see also *People v. Lopez*, 2019 IL App (3d) 170798, ¶ 23 ("[w]here relevant mitigating evidence is before the court, it is presumed that the court considered it absent some indication in the record to the contrary other than the sentence itself"). Trial courts still have wide latitude to determine an appropriate sentence within these noted constraints, and we review a court's sentencing decision for abuse of discretion based on the entire record.[4] *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995); *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). For the following reasons, we find none.

¶ 43 Here, the trial court carefully considered the youth-related factors, as required by 5-4.5-105 of the Code, before concluding that defendant deserved a 35-year sentence, 10 years below the previous sentence. In so concluding, the court found the circumstances of this "very serious" offense did not weigh in defendant's favor, as it involved the death of a young woman and her 6-month in-gestation unborn baby. Indeed, the record supports a finding that defendant had nefarious intent in the lead-up to the crime, as well. He admittedly was angry at Bailon for having ended their relationship and becoming impregnated by another man. Defendant then showed up at Bailon's workplace, displayed harassing behaviors, and took her cell phone, thereby preventing her from calling for help. That same evening, defendant brought a gun with him, then walked Bailon to a secluded area where he shot her in the chest after they argued and he showed her the bullet "for Victor." At trial, although defendant claimed the shooting was an accident, the jury rejected that defense. At resentencing, defense counsel noted defendant's respect for the jury's finding of intentionality, notwithstanding his hearing witnesses' testimony

---

[4]While defendant couches his claim as one involving statutory interpretation, which garners *de novo* review, in reality he is challenging the sentence as improper based on the weight accorded the sentencing factors, which garners abuse of discretion review. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 26.

to the contrary, and the court agreed the shooting was intentional. Thus, to the extent defendant again argues mitigating evidence at resentencing showed the shooting was an accident, he has forfeited that contention. See *People v. Matthews*, 304 Ill. App. 3d 514, 518 (1999).

¶ 44 As the trial court determined, defendant's singular degree of participation in the offense, its intentionality, and its seriousness were not mitigating. That defendant showed remorse and rehabilitation after the shooting and after years of incarceration does not detract from the serious and foreseeably fatal nature of the offenses. See *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 53 (noting, a trial court need not weigh more heavily the defendant's rehabilitative potential); *People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006) (noting, the mere existence of mitigating factors does not obligate the trial court to impose the minimum sentence). The court was in a superior position to weigh evidence and make credibility determinations at sentencing. See *Jones*, 168 Ill. 2d at 373; *cf. People v. Bruce*, 2022 IL App (1st) 210811, ¶¶ 34-35 (finding the opposite). The trial court did not improperly apply the sentencing factors, as the evidence supported the court's findings that the factors were not mitigating. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 35. In reality, the factors were aggravating. See *id*. For those reasons, we cannot say the court's sentencing decision was arbitrary, fanciful, unreasonable, or that no reasonable person would have taken its view. See *People v. Hall*, 195 Ill. 2d 1, 20 (2000) (defining abuse of discretion). In addition, defendant's sentence is not excessive because it is not "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 45 Last, defendant cannot show his trial counsel was ineffective for failing to raise meritless issues. See *People v. Stoecker*, 2020 IL 124807, ¶ 45 ("counsel's failure to pursue a meritless claim cannot constitute deficient representation warranting remand"); *Williams*, 2021 IL App

(3d) 190298, ¶ 26. Similarly, there can be no plain error where, as here, there's no error. See

*People v. Johnson*, 218 Ill. 2d 125, 139 (2005). To the extent defendant raises arguments or

points in his reply brief that he neglected to raise in his opening brief, they are forfeited. See Ill.

S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued shall not be raised in the reply brief).

¶ 46                                    CONCLUSION

¶ 47     For the reasons stated, we affirm the judgment of the trial court.

¶ 48     Affirmed.